Filed 1/5/24  P. v. Mason CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078499 |
| v. | (Super.Ct.No. RIF1800376) |
| TYRONE MASON et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Tyrone Mason.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant Beatriz Adriana Morales.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Caelle McKaveney, A. Natasha

Cortina and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Tyrone Mason and Beatriz Adriana Morales of numerous offenses arising from the abuse of Mason's children. On appeal, Morales argues that during closing argument the prosecutor committed prejudicial error by appealing to the jury's sympathy for the children. In addition, both defendants contend that the trial court erred by not staying sentences under Penal Code section 654 so that each defendant would receive a single unstayed sentence as to each child. (Unlabeled statutory references are to the Penal Code.) We reject the arguments and affirm.

BACKGROUND

A. *Family Background*

Elora M. is the biological mother of K.M. (female, born in August 2007), O.M. (female, born in August 2008), and John Doe (male, born in August 2011) (We refer to all three children collectively as the children and to K.M. and O.M. collectively as the girls.) Mason is the biological father of O.M. and John.

When Elora was 16 years old and pregnant with K.M., she became romantically involved with Mason, who was in his 30's. When the girls were six months old and one and one-half years old, Mason moved them and Elora to live with him in Alabama. While driving there from California, Mason got angry at Elora and kicked her and K.M. out of the car in a parking lot while it was snowing, and he slept in the car. Mason did not allow them back inside the car for about two hours. Elora hugged K.M. to keep K.M. warm.

2

The family lived in a motel in Alabama for about six months. Elora feared Mason because he hit her, pulled her hair, and fractured her finger once. Mason worked but did not give Elora money. Mason kicked Elora and K.M. out of the motel room overnight at least twice per week, even when it was raining and cold outside. Mason did not give Elora or the children much food. He sometimes gave Elora a bag of chips or a cookie, which she would feed to K.M. Elora watered down O.M.'s formula in order to make it last. Mason ate at a fast food restaurant near his workplace. Elora's grandmother eventually moved Elora and the girls back to California.

Mason traveled back to California and continued to see Elora. When John was born in August 2011, Elora realized that she no longer wanted to be involved with Mason. Several months later, Mason told Elora that if she "did not want to be a family with him," then the children "were going to suffer" and "he was not going to stop until [she] came back crawling like the snake that [she] was."

Mason married Morales sometime in 2013. Shortly after that, Elora lost custody of the children, who went to live with Mason, Morales, and Morales's two children— Ruben M. and Aracely L. K.M. was six years old, O.M. was five years old, Ruben was about the same age as O.M., and John was under two years old. Aracely was 14 years old when Mason and Morales married.

B. *The Initial Investigation and the Charges*

In January 2018, the girls ran away from home. They were nine and 10 years old. They escaped through a window in their bedroom.

3

Aracely, who was then 18 years old, called 911 and reported that the girls were missing. Adel Botros, a sheriff's deputy, responded to the call and investigated. Several hours later, the girls were found walking over three miles from home. They were thin and scared. Botros noticed redness on K.M.'s legs and unspecified injuries on O.M. K.M. told Botros that she ran away because her parents hit her with a belt and made her eat vomit.

Later that day, law enforcement found John "on the floor in his room." John appeared "[v]ery weak, tired, looked like maybe he was suffering from the flu" and seemed small for his age. Mason and Morales told Botros that John had the flu. The following day, John was admitted to the hospital and remained there for five days. He was "suffering from severe malnourishment and dehydration."

A social worker and Botros interviewed Morales on the night that the girls were found. Morales admitted striking all three children with a belt and forcing the girls to eat their own vomit.

In 2020, Mason and Morales were each charged by information with (1) one count of torturing John (§ 206; count 1), (2) three counts of child abuse likely to produce great bodily harm (§ 273a, subd. (a); counts 2, 4 & 6)—one count for each child, and (3) three counts of corporal injury to a child (§ 273d, subd. (a); counts 3, 5 & 7)—one count for each child. The conduct was alleged to have occurred between August 2017 and January 2018.

4

C. *The Abuse*

The children testified at trial in 2021, when they were 10, 13, and 14 years old. Forensic interviews were conducted with the children in January 2018. The January 2018 interview of John was cut short because John was frail, emaciated, and wobbly. John was interviewed again in May 2018. Video recordings of all of the interviews (including the first one with John) were played for the jury, and transcripts of the interviews were admitted into evidence.

Notwithstanding minor discrepancies, the children consistently described various forms of mistreatment defendants inflicted on them. Morales called Aracely as a defense witness, but Aracely corroborated much of what the children described.

Both Mason and Morales regularly hit the children with a belt and with their hands, which the children described as being "whooped." Both defendants also hit John with a stick.[1] Mason and Morales hit the children "a lot"—"every single day" or almost every day. Mason and Morales started hitting the children immediately after the children moved in with them and continued hitting the children until the girls ran away.

Morales admitted striking each of the children with a belt once during the week before the girls ran away. Aracely saw Morales hit the children with a belt when Mason was present and when he was not. Aracely did not see Mason beat or threaten Morales to make her hit the children.

---

[1]     John did not specify when or how often defendants hit him with a stick.

Defendants often required the children to remove their pants and underwear when defendants hit them with a belt. Defendants struck the children on their backs, buttocks, sides, and legs. The belt left "'bad'" marks, such as redness and bruising, on the children. Mason sometimes struck K.M. with the metal part of the belt, which would break her skin. K.M. identified a wound on John's back in a photograph taken around January 2018 as being caused by the metal part of the belt.

In addition to hitting the children, Mason and Morales also punished the children by forcing them to eat "nasty" sandwiches that caused the children to vomit. The sandwiches consisted mainly of mustard, raw onions, olives, and tomatoes in between two pieces of bread and would sometimes include raw egg or other "things that [defendants] knew [the children] didn't like."

Defendants together came up with the idea of forcing the children to eat such sandwiches as a form of punishment. Morales admitted feeding the children sandwiches as punishment for "a couple of months" before the girls left. Asked how the punishment originated, Morales responded: "Just made it up."

Mason and Morales sometimes required the children to eat the sandwiches within a specified time, giving them two sandwiches to start and to eat within two or three minutes. When the girls did not eat the sandwiches within the prescribed time, Morales and Mason would give them more sandwiches to eat or "whoop" the girls 10 times before giving them more sandwiches to eat within a new time period. O.M. once had to eat 10 sandwiches in one sitting, resulting in her stomach hurting. When O.M. cried and told defendants that her stomach hurt, they gave her more sandwiches and told her to "finish

6

it." Defendants once gave K.M. one and one-half hours to eat 12 sandwiches. Morales made the sandwiches, and Mason was present. When K.M. did not finish the sandwiches within the allotted period, Mason hit her with a belt 60 to 70 times, at intervals of 10 every time K.M. did not finish eating the sandwiches. K.M. could not sit down afterward.

When defendants fed the children the sandwiches, "there was no shortage of" other food in the home. The rest of the family did not eat the sandwiches. Defendants, Aracely, and Ruben ate "good," or "regular food," such as "[h]ome-cooked meals" that included lasagna, spaghetti, fish, and soup. No food was ever withheld from other family members.

Defendants rarely fed the children anything but the sandwiches. Defendants fed them "something good" once per week. John said that defendants did not feed him anything on days when they did not feed him sandwiches.

According to O.M., defendants started feeding the children sandwiches when the children moved in. Aracely said that defendants started withholding food other than the sandwiches from the children sometime in 2017 and that it "got really bad with the sandwiches" two months before the girls ran away.

The children sometimes vomited when eating the sandwiches. John vomited "a lot of times" eating the sandwiches. Mason made John eat vomit maybe twice, and O.M. ate vomit once. K.M. had to eat her vomit on the occasion when defendants gave her 12 sandwiches. After K.M. vomited, Mason "whooped" K.M. and told her, "well, you better

7

go eat that." Because K.M. "had to eat the throw up, [she] threw up again, so then [she] had to eat it again."

When the children vomited, defendants made the children eat the vomit with spoons. Morales admitted that she had forced the girls to eat vomit with spoons. Morales said that K.M. vomited twice and O.M. vomited once. Mason once put K.M.'s vomit into a bag and made her eat the vomit from the bag. Mason also made K.M. lick a plate full of vomit clean.

Mason and Morales also restricted the children's access to drinking water. Aracely explained that starting around 2017 the children were not allowed to drink water without receiving permission beforehand. Mason and Morales did not let the children drink water from the time they returned home from school in the afternoon until bedtime. Defendants did not like it when the children awoke in the middle of the night needing to use the bathroom or urinated in bed overnight.

According to John, he "never got water" when he lived with Mason and Morales, even though he was "super thirsty" sometimes. Defendants allowed him to drink "toilet water" only. When John asked Mason for water, Mason responded, "Toilet water." John would kneel next to the toilet and put his face inside the toilet to drink the water, which John described as being "nasty." John drank water from the toilet "a lot of times." John never asked Morales for water, and she never gave John any water. According to Aracely, John started drinking water from the toilet one year before the girls ran away.

Sometimes defendants gave K.M. four ounces of water as an incentive or reward for finishing eating the sandwiches. O.M. had difficulty eating the sandwiches because

her mouth was so dry from not drinking water. The children "would sneak" drinking water from various sources, such as the shower, the bathroom sink, the kitchen sink, and the toilet. Aracely watched the children while they were in the bathroom to try to ensure that they did not drink any water. When defendants caught the children drinking water (or Aracely caught them and told defendants), the children "would get in trouble" and get "whooped."

Defendants told the children not to drink water at school, but the children did so anyway. The children "would get in trouble" if they had to use the restroom when they returned home from school. Mason would tell the children that if they "didn't drink nothing at school then how would [they] have to use the bathroom."

Mason and Morales required the children to get permission to use the bathroom and sometimes prohibited it altogether. As a result, the girls urinated elsewhere, such as on themselves, on the floor, in the bed, and in the hamper. John urinated in his bed overnight. When defendants discovered that the children had urinated outside of the bathroom, which happened "all the time," the children "would get whooped or [they] would have to eat those sandwiches." Morales confirmed that the morning before the girls ran away, she forced the girls to eat four sandwiches each because the girls had urinated in bed the night before. Mason once slammed O.M. against the wall because she woke up in the middle of the night and needed to use the bathroom.

Defendants also made the girls stand outside all night and would not allow them to fall asleep. Mason "whooped" O.M. when she banged on the door to be let in and then sent her back outside. Once in November or December 2017, Mason made K.M. take her

9

pants off and stand outside while "it was really cold outside" from 4:00 or 5:00 p.m. until 8:00 or 9:00 a.m. the following morning.

In November or December 2017, defendants made the children sleep outside overnight in the backyard at least once. Mason threw a mattress into the backyard for the children. O.M. said that the children had to sleep outside twice a week and sometimes were not given blankets, even though it was "really cold at night." Being outside at night scared John.

Defendants also forced K.M. to stay outside for a long time during the day when "[i]t was hot" because she did not finish eating sandwiches. K.M. asked for water, but defendants refused and did not give her water when she was allowed back inside.

K.M. never asked for help from anyone at school because she did not know that what Mason and Morales "were doing was bad." K.M. "knew that [she] didn't like what was going on, but [defendants] said [the children] were bad so [she] believed them."

D. *John's Deteriorating Health*

The girls ran away because they wanted to get help for John. John had been "very sick" for more than two or three days, and defendants "weren't doing nothing about it." K.M. feared that John would die. According to Aracely, John "wasn't breathing right," and "it almost seemed like he had to gasp for air." John could not walk on his own. He fell to the floor when he tried to walk. John fell "[a] lot of times." Aracely was "very concerned" about John's condition.

Defendants were nice to John the first day that he was sick and let him watch television and eat ice cream. Defendants then sent John to his bedroom. At some point,

Morales and Aracely attempted to get John to do chores.  John fell.  Morales, along with Aracely, dragged John by his arm.  While Morales and Aracely dragged John, Morales hit him with a belt.

At some unspecified point, Aracely told Mason and Morales that she believed John needed "more nutrition," vitamins, and better food and that she did not believe that John should "just live off sandwiches."  Aracely expressed concern to Morales about John being underweight.  Neither Mason nor Morales did anything in response to Aracely's expressed concerns.  Defendants "just continued giving [John] sandwiches."

E.  *Medical Evidence*

Dr. Sophia Grant, a forensic pediatrician, conducted forensic medical examinations of the children.  The children had bruises in various stages of healing on their backs (John & K.M.), legs (John, K.M., & O.M.), and shoulders (K.M.).  John also had abrasions, a healing and open wound on his back, and scabbing on his spine.  Dr. Grant opined that the patterns of bruises on all three of the children were consistent with the infliction of "repeated blows" and that the injuries were sustained as the result of "several episodes of trauma."  She also opined that the open wound on John's back and some bruising on K.M.'s back were consistent with being struck by the metal part of a belt.  Dr. Grant concluded that the children's injuries were "abusive injuries."

When admitted to the hospital for severe malnourishment and dehydration, John was significantly underweight for a child his age, and his growth was stunted.  He weighed 35 pounds and 12 ounces, while a normal-sized boy of his age should weigh between 46 and 50 pounds.  John was below the third percentile on the growth chart.

11

In addition to Dr. Grant, a registered nurse, a registered dietician, and Dr. William Hamra, another pediatrician, testified about John's condition in the hospital. Bloodwork confirmed that John suffered from nutritional anemia, dehydration, and chronic malnourishment (as opposed to acute malnourishment from being sick). Dr. Grant opined that John suffered from malnutrition as a result of "not being given the proper calories." Malnutrition and nutritional anemia can cause muscle weakness and fatigue, and a person suffering from those conditions could have trouble walking.

John received intravenous fluids for several days to treat dehydration. A registered dietician placed John on a diet plan consisting of nearly 1,800 calories per day, several hundred calories more than ordinarily needed for an average six-year-old. While in the hospital, John did not have any trouble eating. He ate all of the food given to him and asked for more. Six months after being hospitalized, John grew three inches and gained eight pounds, placing him at the 10th percentile on the growth chart.

Drs. Hamra and Grant opined that medical intervention for John had been necessary and that absent such intervention, John was at risk of suffering from long-term and significant consequences from malnourishment and dehydration.

F. *The Verdict and Sentencing*

The jury convicted Mason and Morales on all counts. In February 2022, the trial court sentenced Mason and Morales to consecutive sentences for each offense as follows: (1) seven years to life on count 1, the torture count as to John (§ 206); (2) the middle term of four years for count 2, the child abuse count as to John (§ 273a, subd. (a)); (3) 16 months for each of the corporal injury counts, one for each child (§ 273d, subd. (a);

12

counts 3, 5, & 7); and (4) 16 months for the child abuse counts as to K.M. and O.M. (counts 4 & 6).

The court rejected defendants' argument that under section 654 the court should stay the sentences for counts 2 and 3 as to John, count 5 as to K.M., and count 7 as to O.M.[2] The court reasoned: "I hear the request for [section] 654. I don't believe that's appropriate in this case. There are three children. Crimes occurred over a large span of time. And some were targeted separately, and some were targeted together. And it doesn't appear that the crimes overlap sufficiently enough to justify not sentencing on each charge. So that's what I'm doing at this point for both" defendants.

DISCUSSION

A. *Prosecutorial Misconduct*

Morales argues that during closing argument the prosecutor improperly appealed to the jury's sympathy for the children by urging the jury to hold defendants "'accountable' for stealing the 'innocence' of the child victims." Morales argues that the misconduct resulted in prejudice with respect to the jury's verdict only on count 1, the torture count. The argument is forfeited, and we find no prejudicial error in any event.

1. *Torture*

Section 206 defines the crime of torture as follows: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion,

---

[2] Defendants were sentenced after Assembly Bill No. 518 (2021-2022 Reg. Sess.) amended section 654 so that when section 654 applies the trial court is not required to punish the defendant under the law that provides for the longest possible term of imprisonment. (*People v. White* (2022) 86 Cal.App.5th 1229, 1236.)

13

persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain."

The jury was instructed that to find either defendant guilty of torture in violation of section 206 the prosecution had the burden of proving that (1) "[t]the defendant inflicted great bodily harm on someone else," and (2) "[w]hen inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (CALCRIM No. 810.) The jury was further instructed: "Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

2. *Closing Argument*

The prosecutor argued in closing: "You know, there was—there was a time that I thought I had life figured out. And it sounds ridiculous to say. But whether it was my career, where I was going in life—" Mason's counsel objected that the prosecutor was making an "improper argument," and the court overruled the objection.

The prosecutor continued without any further objection by either defense counsel: "Relationships, whatever it may be, I thought I had it figured out. [¶] As I get older, I look back and I realize that was ridiculous, that I just didn't know what I didn't know. That I didn't know all the millions and countless things I didn't know. But through it all, life's ups and downs, there are few things that have become abundantly clear— abundantly clear to me. One of those things is that life is precious. Our time here is precious. *But more than that, youth and innocence is precious. Innocence.* Because like

14

time, it's fleeting.  It's here one day, and then it's going to be gone.  It fades little by little and it never comes back.

"And as parents, maybe as uncles or aunts, as people who have watched kids or seen kids, we feel a sense of sadness when we see a child grow up and shed that innocence, little by little, as they mature.  It's part of growing up.  *But when that innocence is torn away prematurely, when it is stripped away before it should be, when those kids are forced to see things and experience things that they should never, ever have to see or experience, that's a whole other level of sadness*.

"When a ten-year old girl has to run away from home, she has to run away from the only home she has ever known, she has to run away from the only home she's ever known because someway, somehow, in her little mind, that's how she's going to save herself and her little brother, the little brother that can't walk, that she has to stand up and be the parent that they never were.  *You want to talk about innocence lost and torn away?*

"*I'd like to think that some of that innocence is still there.  I don't know.  We don't know.  The kids probably don't even know.  But what we do know—what we do know is that some of it was robbed from them*.  What we do know is that their childhood is not what it should have been.  And it's not what it could have been.  And I'm not talking about more toys.  I'm not talking about amusement parks or better food.  I'm talking about a couple of simple words.  And the irony runs thick.

"This photo of the belt, it's on a table with placemats.  Table setting mats.  And you'll get this.  And on those mats are the words family and love.  Things that they have

never experienced in that house.  The closest they probably ever got to those words were when they sat at the table on those special, special occasions and got regular food.

"*We ask that you hold them accountable, nothing more, and nothing less*.  Will you do that?  [¶] Thank you."  (Italics added.)

3.  *Deliberations*

On the first day of deliberations, the jury asked for the "legal definition of 'persuasion' under count 1 with torture" and also asked to have Aracely's testimony read back.  The judge answered the first question by telling the jury that any undefined words in the instructions were "to be applied using their ordinary, everyday meanings."  The reporter read Aracely's testimony back to the jury on the morning of the second day of deliberations.

The jury indicated toward the end of the second day of deliberations that it had reached a verdict as to all counts but count 1 for both defendants.  The jury was deadlocked 11 to one on that count and did not believe that further deliberations would help.  After conferring with counsel outside the jury's presence, the judge excused the jury for the day, ordered them to resume deliberations the next morning, and informed the jury that the attorneys would present further argument on count 1 the next afternoon.  The jury returned guilty verdicts on all counts the following day before hearing further argument on count 1.

4.  *Legal Framework*

"In California, the law regarding prosecutorial misconduct is settled:  'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with

16

such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*People v. Masters* (2016) 62 Cal.4th 1019, 1052 (*Masters*).) A prosecutor's "'appeal for sympathy for the victim is out of place during an objective determination of guilt.'" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130 (*Kipp*).)

Even if prosecutorial misconduct occurs, reversal is not required unless the defendant demonstrates that prejudice resulted. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) To the extent that prosecutorial misconduct implicates federal constitutional rights, we review the error under the harmlessness standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (*Fernandez, supra*, at p. 564.) We otherwise review the error under the state law harmlessness standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Parker* (2022) 13 Cal.5th 1, 71-72 (*Parker*).)

5. *Analysis*

The People contend that Morales forfeited the argument, and we agree. In general, a criminal ""'"defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."'"" (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) Neither defendants' counsel objected to the prosecutor's argument about holding defendants accountable for the lost innocence of the children, so the argument is forfeited.

17

We reject Morales's contention that Mason's counsel preserved the argument by objecting when the prosecutor began discussing his own life. That portion of the closing argument had nothing to do with the children's lost innocence or how the jury should hold defendants accountable. Nothing at that point in the argument indicated that the prosecutor's reflections about his life would lead him to talk about the innocence of children in general or how defendants should be held accountable for taking the victims' innocence in particular. Mason's counsel's objection thus was not """"on the same ground"""" as Morales's argument on appeal and accordingly was not sufficient to preserve the argument being made on appeal. (*Centeno*, *supra*, 60 Cal.4th at p. 674.) We therefore conclude that any argument concerning the prosecutor's remarks about the children's lost innocence was forfeited. Moreover, because no circumstances suggest that an objection and request for admonition would have been futile, the failure to object was not excused. (*Ibid.*)

Morales argues that if the premature objection was not sufficient, then her counsel was ineffective for not objecting specifically to the prosecutor's comments about holding defendants accountable for the children's loss of innocence. "A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense

18

counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

The record does not reveal anything about the reason why Morales's counsel did not object to the challenged remarks. There would seem to be at least one plausible reason not to object—defense counsel did not want to inflame the jury by making an objection that might be perceived as questioning whether the children were in fact innocent when they were six, nine, and 10 years old and Morales struck them with a belt, forced them to eat vomit, and fed them sandwiches designed to make them vomit—*all of which she admitted doing*. Given that we can conceive of at least one tactical reason for counsel's failure to object, we reject Morales's argument that the failure to object constituted ineffective assistance. (*Lopez*, *supra*, 42 Cal.4th at p. 966.)

In any event, even if we assume for the sake of argument that the prosecutor's comments amounted to misconduct, any error was harmless. (Cf. *People v. Goldberg* (1952) 110 Cal.App.2d 17, 25 [finding nothing "inherently or legally wrong with" the prosecutor's statement during closing argument "that 'there is nothing so innocent as an innocent little girl, and nothing so low in my mind as the man who would sink to contaminate them'"].) To the extent the prosecutor's statements were improper, the statements were not so egregious as to infect the entire trial with a degree of unfairness amounting to a federal constitutional violation. (*Masters*, *supra*, 62 Cal.4th at p. 1052.) We accordingly review the presumed error under the state law harmlessness standard. (*Parker*, *supra*, 13 Cal.5th at pp. 71-72.)

19

There is no reasonable probability that the jury would have reached a different result on count 1 as to Morales had the prosecutor not made the comments about holding defendants responsible for the children's loss of innocence. The remarks at issue were limited to a few sentences in the prosecutor's closing argument and were mild and brief in comparison to (1) the six-day trial in which 19 witnesses testified (including all three children, Aracely (who corroborated the children's accounts), and four medical professionals who treated John while he was hospitalized), and (2) the prosecutor's remaining closing and rebuttal arguments, which spanned about 43 pages of the reporter's transcript. (*Kipp*, *supra*, at p. 1130 [reversal not required when the prosecutor improperly appealed to the jury's sympathy for the victim given that the "comment was brief, mild, and not repeated"].) Moreover, the prosecutor did not say anything about the children's innocence in rebuttal. (*Ibid.*) And the remarks "did not 'add cumulative impact to other errors in a crucial area of the case,'" as neither defendant argues that any other trial-related error occurred. (*Ibid.*)

In addition, there was overwhelming evidence of Morales's guilt on count 1. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 ["Despite this misstep, however, we find the prosecutor's misconduct in making a few remarks in a much longer closing argument, and an even longer trial, could not have prejudiced defendant, especially given the strong evidence of his guilt"]; *People v. Hart* (1999) 20 Cal.4th 546, 619-620.) John was hospitalized for severe malnutrition and dehydration caused by prolonged starvation. Morales did not provide John any water for months or longer. The only food that Morales provided John was "nasty" sandwiches that made him vomit. The week before

20

John was hospitalized, he became so weak from malnourishment and dehydration that he could not walk on his own and had difficulty breathing. Aracely told Morales that she was concerned about John's condition and that she believed that John needed to be fed more than just the sandwiches that made him vomit. When John was too weak to stand on his own, Morales dragged him out of his room by his arm and beat him. Those facts were essentially uncontested, having been admitted by Morales and corroborated by her own witness, Aracely, and they overwhelmingly supported the jury's finding that Morales inflicted great bodily harm on John with the intent to cause him "cruel or extreme pain and suffering" for a sadistic purpose. (§ 206; *People v. Flores* (2016) 2 Cal.App.5th 855, 871-872 [substantial evidence supports torture conviction based in part on prolonged starvation that resulted in the child victims' hospitalization].)

Focusing on the jury's deliberations, Morales argues to the contrary that the "case was close as to Count 1" and that the lone holdout juror could have ultimately been persuaded to find Morales guilty on that count based on "the prosecutor's emotional but legally improper argument that the children's innocence had been torn from them" and that Morales should be "held 'accountable'" for that. We disagree. The jury's questions suggest that the jurors were engaged in a "careful evaluation of the evidence" and not affected by the putatively improper comments. (*People v. Arias* (1996) 13 Cal.4th 92, 161.) In addition, the prosecutor's statements were not directed toward the torture count in particular, and the jury had already reached guilty verdicts as to the other crimes when the jury announced that it was deadlocked as to count 1. Nothing suggests that the jury would not have reached a guilty verdict as to Morales on count 1 absent the prosecutor's

brief remarks days earlier about holding defendants accountable for depriving the children of their innocence.

For all of these reasons, we conclude that there is no reasonable probability that the jury would have reached a different verdict on count 1 had the prosecutor not asked the jury to hold defendants accountable for depriving the children of their innocence.

B.  *Section 654*

Defendants argue that the trial court erred by not applying section 654 to stay all but one sentence for the crimes committed against each child.  We are not persuaded.

Section 654 provides:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective.  [Citations.]  We first consider if the different crimes were completed by a 'single physical act.'  [Citation.]  If so, the defendant may not be punished more than once for that act.  Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives."  (*People v. Corpening* (2016) 2 Cal.5th 307, 311.)  "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were

incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*People v. Correa* (2012) 54 Cal.4th 331, 336.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) We uphold the trial court's express or implied factual findings if supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.) "We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*Jones*, *supra*, at p. 1143.)

The conduct underlying all seven counts was alleged to have occurred over the same period. The prosecution relied on course of conduct theories to prove the torture count involving John (count 1) and the child abuse likely to cause great bodily harm counts against each child (counts 2, 4, & 6).

For the corporal injury counts as to all three children (counts 3, 5, & 7), the prosecution relied on defendants' acts of striking the children with belts. The jury accordingly was given a unanimity instruction as to those counts. The instruction provided that the jury could not convict on those counts unless (1) "[f]or each separate count, [the jurors] all agree that the People have proved that the defendant committed at least one of the charged acts and [the jurors] all agree on which act he committed," or (2) "[f]or each separate count, [the jurors] all agree that the People have proved that the defendant committed all the acts alleged to have occurred during that time period and have proved that the defendant committed at least the number of offenses charged."

23

Defendants do not contend that the crimes of torture, child abuse, and corporal injury committed against John and the crimes of child abuse and corporal injury committed against K.M. and O.M. were accomplished by a single physical act. Nor do they contend that the crimes against each child were committed by an indivisible course of conduct. Instead, defendants argue that because the prosecution relied on course of conduct theories to prove torture as to John and child abuse likely to produce bodily harm as to all three children, all of defendants' criminal acts committed against each child comprised the conduct underlying the torture and child abuse counts, so all of the acts constituted the same "act or omission" for purposes of section 654. (§ 654, subd. (a).)

Defendants rely on this court's opinion in *People v. Mejia* (2017) 9 Cal.App.5th 1036 (*Mejia*) to support their argument. In *Mejia*, the defendant was convicted of one count each of torture, spousal rape, infliction of corporal injury on a spouse, and criminal threats. (*Id.* at p. 1039.) The prosecution relied on a course of conduct theory to prove torture. (*Id.* at pp. 1043-1044.) The defendant argued that section 654 precluded imposition of unstayed sentences as to all of the crimes because all of the offenses were committed during the same three-month period "in furtherance of the single objective of causing the victim cruel pain and suffering." (*Mejia*, *supra*, at p. 1043.) *Mejia* did not reach the second step of the section 654 analysis and thus did not examine whether the defendant harbored a single objective or multiple objectives in committing the crimes, reasoning that "[t]he fact that the 'umbrella' crime of torture was committed by a course of conduct does not mean that a section 654 'indivisible course of conduct' analysis is appropriate." (*Mejia*, at p. 1043.)

24

*Mejia* held that section 654 prohibited punishing the defendant for both torture and the underlying acts of spousal rape and corporal injury "because the prosecution relied upon each act of spousal rape and each act of infliction of corporal injury on a spouse as the intentional acts underlying the torture conviction" (*Mejia*, *supra*, 9 Cal.App.5th at p. 1045), so "all of the acts of spousal rape and of infliction of corporal injury on a spouse were included among the acts underlying the torture count and were essential to satisfying an element of that offense" (*id.* at p. 1046). *Mejia* explained that the same analysis "would not apply if the record supported the conclusion that any one of either type of crime was committed outside of the torture course of conduct." (*Id*. at p. 1045.) *Mejia* found that there was "no evidence that any of the acts of rape" or any of the acts of inflicting corporal injury on a spouse were "not a part of that course of conduct." (*Ibid.*)

Defendants argue that under *Mejia* section 654 applies in this case so that each defendant should each receive only one unstayed sentence for the multiple convictions for crimes committed against each child. We disagree. The multiple unstayed sentences imposed on both defendants are consistent with *Mejia*.

As to the corporal injury counts (counts 3, 5, & 7), the jury was given a unanimity instruction, and the prosecutor argued that the counts were based on either a single agreed-upon act of striking each child with a belt or all of defendants' acts of striking the children with belts. Because the corporal injury convictions were necessarily based on defendants' acts of striking the children with belts, the trial court was required to find that the corporal injury convictions were based on at least one agreed-upon act of striking the children with belts or all of defendants' acts of striking the children with belts for the

25

purposes of section 654. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339 ["where there is a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654"].)

By not staying any of defendants' sentences under section 654, the trial court implicitly found that one or all of defendants' acts of striking the children with belts underlying the corporal injury convictions were not "essential to satisfying" any element of the other crimes (*Mejia*, *supra*, 9 Cal.App.5th at p. 1046) and thus were "not a part of [the] course of conduct" supporting the torture and child abuse convictions (*id.* at p. 1045). Substantial evidence supports that determination.

With respect to the girls, the trial court could reasonably infer that defendants' child abuse convictions were based on defendants' other acts of abuse committed against the girls, such as striking the girls with their hands, not allowing the girls to drink water, and forcing the girls to eat vomit. Thus, none of defendants' acts of striking the girls with belts was "essential to satisfying" any element of the child abuse counts. (*Mejia*, *supra*, 9 Cal.App.5th at p. 1046.) Alternatively, the trial court could reasonably infer, on the basis of substantial evidence, that the corporal injury convictions were based on one instance per child of being struck with a belt and that the other instances in which defendants struck the girls with belts were part of the course of conduct forming the basis of the child abuse convictions. Substantial evidence thus supports the trial court's implied finding that defendants' acts of hitting the girls with belts were "committed outside of the [child abuse] course of conduct." (*Id.* at p. 1045.)

Likewise, as to John, substantial evidence supports the trial court's implied finding that all of defendants' acts of striking John with a belt (or at least one of those acts) were not essential to satisfying any element of the torture count. Rather, the trial court could have reasonably inferred from the evidence that the acts underlying the torture count were the acts that resulted in John's hospitalization, namely, defendants' acts of starving John and not allowing him to drink water. Similarly, the trial court could have reasonably inferred from the evidence that defendants' acts of striking John with their hands and a stick formed the basis of the child abuse conviction, which therefore was based on acts distinct from defendants' acts of striking John with a belt or starving and dehydrating him. (See *People v. Assad* (2010) 189 Cal.App.4th 187, 200 [trial court did not err by declining to stay sentences under section 654 for either torture or aggravated mayhem counts that were both based on course of conduct theories because the trial court reasonably could have concluded that the counts "were not based on the same conduct or course of conduct"].) As with O.M. and K.M., substantial evidence accordingly supports the trial court's implied findings that defendants' acts of hitting John with a belt were "committed outside of the torture [and the child abuse] course[s] of conduct" and that defendants' acts of striking John with their hands also were "committed outside of the torture course of conduct." (*Mejia*, *supra*, 9 Cal.App.5th at p. 1045.) Alternatively, substantial evidence also supports an implied finding that the corporal injury count was based on a single act of striking John with a belt and that defendants' other acts of striking John with a belt were part of the course of conduct supporting the child abuse or torture convictions. Either way, substantial evidence supports the implied finding that the

27

acts underlying the convictions for child abuse and corporal injury as to John were not "essential to satisfying an element" of the torture conviction. (*Id.* at p. 1046.) Applying *Mejia*'s analysis, we conclude that the trial court did not err by not staying any of defendants' sentences under section 654.

Defendants' argument to the contrary is unavailing. In support of their argument that defendants' crimes against each child were all the same act for purposes of section 654, defendants point out that the prosecutor argued to the jury that the courses of conduct underlying the torture count and the child abuse counts included all of the acts of abuse defendants perpetrated against the children, including hitting the children with belts. The argument fails because it misunderstands the import of the prosecutor's decision to proceed on course of conduct theories as to the torture and child abuse counts. The course of conduct theories made it unnecessary to give unanimity instructions as to those counts. (*People v. Percelle* (2005) 126 Cal.App.4th 164, 181.) But that does not mean that in order to convict on those counts the jury had to base all of those convictions on every abusive act of which there was any evidence. (See *People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [for § 273a child abuse offense based on a course of conduct theory, "[t]he issue before the jury was whether the accused was guilty of the course of conduct, not whether he had committed a particular act on a particular day"].) For example, the jury could have (1) convicted defendants on the corporal injury counts (counts 3, 5, & 7) on the basis of one instance per child of being hit with a belt, (2) convicted defendants on the child abuse counts (counts 2, 4, & 6) on the basis of other instances of the children being hit with belts, and (3) convicted defendants on the torture count (count 1) on the

basis of the starvation and dehydration of John. Such a verdict would be fully consistent with the jury instructions, would not be prohibited by the prosecutor's course of conduct theories, and would support the trial court's ruling that section 654 did not apply.

For the foregoing reasons, we conclude that the trial court did not err by declining to stay any of defendants' sentences under section 654.

DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____<br>J.

We concur:

FIELDS_____
<br>       Acting P. J.

RAPHAEL_____
<br>       J.